# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 27, 2012

## STATE OF TENNESSEE v. TRACY A. ROBERSON

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 270259    Rebecca J. Stern, Judge**

_____

**No. E2011-01907-CCA-R3-CD-FILED-OCTOBER 24, 2013**

_____

A Hamilton County jury convicted the Defendant, Tracy A. Roberson, of one count of aggravated burglary, one count of especially aggravated kidnapping, one count of aggravated robbery, two counts of aggravated rape, one count of theft of property valued under $500.00, one count of theft of property valued over $1,000.00, and one count of theft of property valued over $60,000.00. For these convictions, the trial court sentenced the Defendant to serve an effective sentence of sixty years in the Tennessee Department of Correction. On appeal, the Defendant claims that: (1) the trial court erred when it denied his motion to suppress evidence obtained through an invalid search warrant; (2) the evidence is insufficient to support his convictions for especially aggravated kidnapping, theft of property valued over $1,000.00, and theft of property valued over $60,000.00; (3) the trial court failed to merge his convictions for aggravated robbery, aggravated kidnapping, and theft; (4) the trial court improperly instructed the jury on especially aggravated kidnapping; (5) the trial court erred when it ordered consecutive sentencing; (6) the trial court demonstrated bias against the Defendant; and (7) the cumulative effect of the errors deprived the Defendant of a fair trial. We conclude that there was insufficient evidence to support the Defendant's conviction for theft of property valued over $60,000.00, and we modify the conviction to theft of property valued over $10,000.00. We further conclude that the theft of property valued under $500.00 should be merged into the aggravated robbery conviction. We affirm the trial court's judgments in all other respects. The case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed in Part, Affirmed in Part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, joined.

Donna Miller (on appeal) and Robin R. Flores (at trial), Chattanooga, Tennessee for the appellant, Tracy A. Roberson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Neal Pinkston, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the burglary of a home where the victim was "housesitting" on August 7, 2008. During the night, a man entered the home, bound the victim's legs and arms with duct tape, and then removed the homeowner's safe. The man then returned, raped the victim, and threatened to retaliate if she reported his conduct. The man took the victim's driver's license and $60.00 in cash and left. A short time later, he returned, this time taking the victim's car keys and driving her vehicle a short distance before abandoning it.

After a police investigation, a Hamilton County grand jury indicted the Defendant with regard to this incident for one count of aggravated burglary, one count of especially aggravated kidnapping, one count of aggravated robbery, two counts of aggravated rape, one count of theft of property under $500.00, one count of theft of property over $1,000.00, and one count of theft of property over $60,000.00.

**A. Motion to Suppress**

The Defendant filed a motion to suppress evidence found during a search of his home and vehicle. In his motion, the Defendant asserted that the police improperly entered his property and conducted a limited search of his residence in an attempt to locate his vehicle. He stated that police then relied upon information found during this search to subsequently obtain a search warrant from a judge, rather than a judicial commissioner, and that the judge issuing the warrant had received campaign contributions during his election from the owner of the home where the victim was housesitting. The Defendant further argued that the detective who had drafted the affidavit in support of the search warrant failed to establish probable cause that the Defendant had committed a crime or that evidence would be found at his home or in his vehicle.

The trial court conducted a hearing on the motion, during which the parties presented the following evidence: Richard Roberson, the Defendant's grandfather, testified that in August 2008, the Defendant lived with him in Hixson, Tennessee. Roberson described his house as having a five-foot high picket fence along the front, which was lined with Bradford

pear trees. He said a driveway ran down the right side of the house to the back where the garage was located. An RV was in the backyard, and the Defendant's vehicle was in the garage. He described tall hedges located along the sides of the house, saying that the shrubbery was overgrown because his health had prevented him from maintaining the yard. Roberson said that a person would be unable to see the garage or RV from the front road.

Roberson testified that, at around 1:30 p.m. on August 7, 2008, he awoke to find police officers "milling around" outside his house. He stepped out on his porch "[t]o find out what was going on" and found the Defendant speaking to the police. Shortly thereafter, police placed the Defendant in a police vehicle. Roberson told police that he needed to pick up the Defendant's daughter from school. A police officer escorted Roberson into his house while Roberson changed and then walked Roberson out. Roberson said the police officer did not go anywhere in the house other than to escort Roberson in and out and that the police officer did not take anything from his home. Roberson left the house to pick up the Defendant's daughter from school and did not return until around midnight. Roberson said he waited "another hour or two" before police allowed him to re-enter his home. Roberson said that police officers showed him a search warrant at "one or two in the morning."

On cross-examination Roberson testified that nothing obstructed his driveway from the street. He explained that the five-foot picket fence ran on either side of the driveway but did not close off his driveway from the public street. Roberson said that he did not see police officers go inside the Defendant's vehicle. He recalled that police officers asked permission, which he granted, to search Roberson's truck before he went to pick up the Defendant's daughter from school.

The Defendant testified that he saw a police vehicle pull into the driveway at 1:56 p.m. on August 7, 2008. The Defendant said that one police officer "drove to the back corner of the house and was standing at the back corner of the house" when the Defendant came outside. The Defendant said that police never presented him with a search warrant or arrest warrant. The Defendant said that he was placed in the front passenger seat of a police vehicle and told they were "detaining [him] for the city." As the Defendant sat in the vehicle, he observed two officers "wandering around the back of the house."

On cross-examination, the Defendant testified that his car was parked on the right-hand side of the two car garage and was visible from the back of the house. The Defendant agreed that police officers saw his black BMW when they initially pulled into the driveway. The Defendant said that he was unaware at the time of the search that he was a suspect in these crimes.

Melissa Croft testified that she and the Defendant had a child together. Croft recalled

that the Defendant drove her to the hospital on August 6 in his grandfather's truck. Croft inquired about the Defendant's BMW, and the Defendant told her that his cousin had borrowed the car. They returned to the Defendant's home at 10:00 p.m. or 11:00 p.m. and, when the Defendant parked the truck next to the house, Croft did not see the BMW inside the garage. Croft said that she did not see the BMW the following morning, August 7, when she left the house at 7:00 a.m.

Following the proof, the trial court denied the motion after making the following findings:

> I find that there was probable cause for [the police] to be there looking for [the Defendant] and detaining him. I find that they did nothing improper driving down the driveway, seeing the BMW, and not conducting a search at the time, securing the premises and going for a search warrant. I find that there was nothing improper about going to Judge Steelman instead of a magistrate and obtaining a search warrant. I find that there's probable cause in the search warrant for . . . going to his home and searching his home and car based on all the information that they had and that's contained in the search warrant.

## B. Trial

At the Defendant's trial on these charges, the parties presented the following evidence: Lucas Timmons, a Chattanooga Police Department officer, testified that, at a little after 2:00 a.m. on August 7, 2008, he responded to a call at the 1500 block of Mississippi Avenue. Police had received a report of a dark-colored vehicle parked in front of an empty house where two males were "checking out" the house. After investigating the complaint, and as Officer Timmons was leaving, he noticed a black BMW parked approximately a half of a block down the street. Based upon the report of a dark-colored vehicle, Officer Timmons ran the license plate to identify the owner. The black BMW was registered to the Defendant.

Officer Timmons testified that, later that same morning, he was dispatched to investigate the report of a potential rape/burglary at a residence located on Centennial Drive, which was in the same area where he had earlier observed the black BMW. He arrived at the residence shortly after 5:00 a.m. A neighbor met him outside and lead him into the house. Inside a bedroom in the house, Officer Timmons found the victim on the side of the bed with her hands duct-taped behind her back and her ankles duct-taped together. Officer Timmons said that he cut the tape from her wrists and ankles, and he described the victim as "extremely upset and frightened." The victim told the officer she had been slapped in the face, and the officer testified that he observed minor swelling in the area.

-4-

Officer Timmons testified that he walked through the entire house and found evidence of forcible entry through the basement door at the rear of the house. Officer Timmons also observed a wall in the master bedroom closet that was damaged and a hammer lying on the floor near the area. Officer Timmons described the damage as a hole in the wall that appeared to be where a wall safe would be kept. As Officer Timmons was exiting the home, the victim advised him that her vehicle was missing.

Officer Timmons said that he proceeded nearby to the 1500 block of Mississippi Avenue where another officer had found the victim's vehicle parked. Officer Timmons said that he found it "curious" that the victim's vehicle was parked directly behind where the Defendant's black BMW had been parked a few hours earlier. The Defendant's BMW was no longer there.

The victim testified that she was nineteen-years old and a college student at the time of these crimes. She was staying in the home on Centennial for a few days while the homeowners, Allen and Alison Lebovitz, were out of town. The victim recalled that she babysat all day for the Lebovitz's next door neighbors and then went to her apartment to gather a few items before going to the Lebovitz's home for the night. At around 10:45 p.m., she took the Lebovitz's dog outside before going to bed. At around 2:00 a.m., the dog began barking, so the victim took the dog outside again, locking the doors after she returned back inside the house.

The victim testified that the dog awoke her again barking. She assumed the dog needed to go outside and picked up her cellular phone to check the time and saw it was 4:00 a.m. Almost immediately she heard footsteps and realized a man was in her room, which she described as dimly lit. The man walked around to the victim's side of the bed. She said that she saw a small light that appeared to be emanating from an item held in the man's hand, but she could not determine the source of the light. She compared the light to a small flash light found on some types of cellular phones. The man yelled at the victim to put her cellular phone down and began hitting the victim. The victim could not see what was in the man's hand but felt a hard object as he repeatedly hit her. The victim dropped her cellular phone, and the man picked it up and placed her phone on the bed side table out of the victim's reach. The man then bound the victim's hands behind her and her feet together with duct tape. The man asked the victim where the safe was located in the house, and the victim told him she did not know. The victim said that she could hear the man going through the rooms of the house until he found the safe. She then heard banging and hammering for approximately a half hour coming from the upstairs bedroom.

The victim testified that the man came in and out of her room multiple times, and she observed that he was wearing a brimmed hat and a bandana around his head that "came down

to a point at his chin." She said the man wore heavier shoes "like maybe work boots" and also pants and either a three-quarters length shirt or a long-sleeved shirt with the sleeves pushed up. She described something like a fanny pack or tool belt around the man's waist, from which she heard metal "clanking together." The man also wore short gloves that she described as being neither leather nor cloth. The victim identified a hat collected from the Defendant's vehicle as looking like the hat the man wore the night of the burglary. The victim then felt a pair of gloves also collected from the Defendant's vehicle and agreed that the gloves felt the same as those worn by the intruder when he touched her.

The victim testified that the man returned to the room and said to the victim, "you said you would do whatever I asked and now it's time." The victim said that she had never made such a statement to the man. The man turned the victim over, pulled her pajama pants down and raped her. The victim recalled that the man called her "baby." The victim began screaming, and the man told her that he would "bust [her] head in if [she] didn't stop." In her statement to police, the victim said the man said to her, "I have guns, don't make me use them."

After the man penetrated the victim both anally and vaginally, he pulled her pajama pants back up and walked over to her backpack. He found her wallet, took out her driver's license, and addressed her by name saying that he was going to take her driver's license so that if she made a report to police, he would know her name and where she lived in order to find her. The victim said her school identification was also in her wallet. Upon seeing the school identification he told the victim to stay in school so that she could get a good job. He then told the victim that it was 5:00 a.m. and that the housekeeper would arrive at the house at 7:00 a.m. He said that he would return and remove the duct tape before the housekeeper arrived, and he left the room. Less than a minute later, he came back into the room, went through the victim's backpack and took her car keys. The man left through the front door of the house.

The victim testified that she waited for a period of time and when she heard no noises she slid off the bed and retrieved her cellular phone from the bedside table to call 911. The parties then stipulated that a recording submitted by the State was the 911 call placed by the victim.

The victim testified that two weeks before her stay at the Lebovitz's home, there had been a storm that caused damage to the roof of the house. The victim said that a construction crew worked on the roof while she stayed there. The victim said that she did not know Wayne Ledford but that he was working with the construction crew at the Lebovitz house. She said that the man who raped her was not Ledford. She explained that the man spoke "a lot," and she had spoken with Ledford the day before and it was not his voice.

The victim testified that she had a 2004 Ford Escort that was taken that night. The victim testified that she had "no idea" of the value of the vehicle. The victim said that the man also took $60.00 cash from her purse.

On cross-examination, the victim explained that she babysat for the Lebovitz's next door neighbors on both Tuesday and Wednesday. On Tuesday, when she returned to the Lebovitz's home, the construction crew was at the house for approximately an hour and she spoke with Ledford. She provided this information to police, even though it occurred the day before the burglary, to help develop potential suspects. After babysitting on Wednesday, August 6, 2008, and going to her apartment, she returned to the Lebovitz's home where she was alone.

April Tumlin, a sexual assault examiner, testified that she examined the victim on August 7, 2008. Tumlin said that the victim explained what had occurred during the assault, and then Tumlin conducted a physical assessment of the victim. She prophylactically treated the victim for sexually transmitted diseases and conducted an anal and vaginal exam, which included swabs for DNA testing. Tumlin said that the victim had a small abrasion to her left eyelid and a small abrasion to her left ear. During the vaginal exam, Tumlin found a small abrasion at the base of the victim's vagina. Tumlin described the victim as fidgeting, "reluctant to speak," and crying during the exam. Tumlin said that the victim indicated that she had been penetrated vaginally and then anally for a short time before the man penetrated her vaginally again.

Alan[1] Lebovitz testified that he lived at 1104 Centennial Drive. Lebovitz recalled that on August 6 and 7, 2008, he was in New York City and returned home on August 7, 2008. Lebovitz said that, during his departure, a construction crew worked on roof and water damage sustained to the house during a bad storm, and Wayne Ledford supervised the project. Lebovitz said that Ledford had worked on several projects on the home over the past two to two and a half years. Lebovitz said that a guest room was located on the main floor of his home, and the master bedroom was upstairs. Lebovitz testified that he had a safe in his house that was located inside a closet "off the master bedroom/bathroom."

Lebovitz testified that he learned of the burglary to his home at approximately 6:30 a.m. on August 7, 2008, and he arrived home at approximately 3:00 p.m. that afternoon. When he arrived, he found that the safe had been forcibly removed from the closet. He said that he kept passports, paperwork, small jewelry items, an antique watch, and some cash in

---

[1] The trial transcript spells Mr. Lebovitz's first name as "Allen" while the indictment and supporting police documents spell Mr. Lebovitz's first name as "Alan." For purposes of this opinion, we use the spelling used in the indictment.

the safe. He estimated a total value of the items inside the safe of $57,612.00. This value was based on appraisals through the insurance agency and the purchase price of some of the items. He estimated the value of the safe at between $1,000.00 and $2,000.00. Lebovitz identified a black and gray gym bag that he had been missing for the past year. Lebovitz also identified the safe that was inside the gym bag as the one that had been removed from the closet in his home. On cross-examination, Lebovitz said that the hammer found in the closet did not belong to him.

Heather Stone, a Chattanooga Police Department officer, testified that she processed the crime scene, the Defendant's residence, and the Defendant's BMW for fingerprints and evidence. Officer Stone identified evidence collected from the crime scene, which included a Jansport book bag, duct tape, bedding from the bed the victim slept in, and a fiberglass claw hammer. Later that day, Officer Stone reported to the Defendant's residence for further collection of evidence. Officer Stone said that she was instructed to look for several items: a "boonie-type" hat, a dark-colored bandana, a long-sleeved shirt, jeans, a tool belt, leather or suede work gloves, a metal safe, passports, jewelry, and a Verizon wireless cellular phone. Officers processed the Defendant's BMW first and, upon opening the trunk of the car, Officer Stone saw a blue boonie hat and a rolled up long-sleeved red shirt. Upon further inspection, Officer Stone observed a gun, a gun belt, and a black duffel bag with a safe inside. The BMW was transported back to the police department where the BMW was photographed and the contents inventoried.

Officer Stone testified that, in the driver's side door pocket, police found flashlights, one of which was a gun tac light. Officer Stone described a tac light as a small light that attaches to the under side of a pistol barrel. Between the console and the driver's seat, police found a Glock pistol wrapped in a Nautica shirt. The Glock was loaded with a magazine and another magazine was found in the console of the car. In the glove compartment box, police found two packaged Lifestyle condoms, two packaged Durex condoms, two packages of sexual stimulants, Stamina Rx tablets, one of which was empty, and a "mini ephedrine packet of pills" with several pills missing. On the floorboard behind the driver's seat, police found a "flag of our fathers" green bag that contained a pair of black tactical police gloves, a stack of 50 one dollar bills, a stack of 24 one dollar bills, and a stack of 53 one dollar bills. From the trunk, police collected a Cabelas' camouflage fanny pack. Inside the fanny pack were three screw drivers, a hammer, a chisel, a small crow bar, "a glass suction cut item," a half face mask, and a roll of black duct tape.

Officer Stone testified that the dial on the safe she found in the trunk of the Defendant's BMW was missing, and the door was broken. Inside the safe were passports and paperwork. Inside the trunk, police found black hand ties, tools, an extension cord, police body armour, a ski mask that covered the entire head except for the eye area, a fanny pack,

black duct tape, a blue bucket with cleaning supplies, a red long-sleeved shirt, and a black bag that contained two black crow bars, a wrench, a chisel, and a Dewalt grinder. Police also found a police duty belt containing a Glock 23, 40 caliber pistol with a full 13- round magazine, pepper spray, handcuffs, a flashlight, a baton, and two gun magazines.

Officer Stone testified that, after the Defendant was transported to the police department, she obtained a buccal swab and fingerprints from the Defendant for analysis.

Gregory Mardis, a Chattanooga Police Department officer, testified that he was assigned to the crime scene unit and helped processed the victim's car for evidence. On the front floorboard of the vehicle, the officer found a bag, a checkbook, and the victim's Tennessee driver's license. Later that day, Officer Mardis searched the Defendant's house for evidence. Officer Mardis said that he collected two pairs of underwear and a pair of gloves. Officer Mardis testified that he swabbed the Defendant's penis for DNA analysis.

Steve Wertel testified that he worked in the Chattanooga Police Department as a crime scene investigator in August 2008. In furtherance of the investigation in this case, Officer Wertel collected a buccal swab from Wayne Ledford. He also obtained seven latent fingerprints from the Defendant's BMW: three from the driver's side door, one from the passenger side door, one from the passenger side rear glass, and two from the trunk of the car.

Ed Duke, a Chattanooga Police Department fingerprint examiner, testified as an expert in the area of latent fingerprint identification. Officer Duke compared the latent fingerprints found on the Defendant's BMW to a known set of fingerprints from the Defendant. Only four of the latent fingerprints were identifiable and all four were matched to the Defendant as the contributor.

Alexis Mercado, a Chattanooga Police Department officer, testified that he reported to the crime scene at 7:00 a.m. on the morning of August 7, 2008. After learning the Defendant's name from the tag information on his BMW, police officers began asking potential witnesses if they recognized the name. Police officers asked Wayne Ledford, a supervisor of the construction being done on the Lebovitz's home, and he said that he recognized the name as his cousin's. Later that same day, Officer Mercado participated in the execution of a search warrant at the Defendant's residence, where the Defendant was placed under arrest. At the police station, a cellular phone was taken from the Defendant's person. Through the telephone number associated with the phone, the police obtained cellular phone call records showing the call activity for the phone.

Officer Mercado testified that he obtained a value for the victim's vehicle from Kelly Blue Book. The Kelly Blue Book listed varying values for a vehicle based on the condition

of the car. Officer Mercado testified that the victim's car was a two-door Ford Escort. For a two-door Ford Escort, the value for a vehicle in "excellent condition" was $3,665.00, for a vehicle in "good condition" $3,270.00, and a vehicle in "fair condition" $2,805.00. Officer Mercado described the victim's vehicle as being in the "fair category." Photographs of the victim's vehicle were also submitted to the jury.

On cross-examination Officer Mercado testified that, when officers arrived at the residence where the Defendant was staying, the Defendant's black BMW was parked in the back portion of the driveway. He said that no one touched the BMW until he obtained the search warrant.

Mark Hamilton, a Chattanooga Police Department officer, testified that he is trained to conduct technological investigations, which includes cellular phone records analysis. He explained that cellular phones communicate through towers that are located throughout a city. When a transmission occurs, the cellular phone company records the activity. Officer Hamilton said that the cellular phone on the Defendant's person at the time of his arrest was a Cricket cellular phone. He identified the phone records for the number associated with the phone taken from the Defendant and a listing of the location of all Cricket cellular phone towers in the area.

Hamilton identified a map he created showing the location of the cellular phone towers used to transmit the Defendant's phone calls throughout the night of August 6 and the morning of August 7, 2008. At 11:13 p.m., cellular phone activity for the Defendant's phone was transmitted using a tower near the Defendant's residence. There were three cellular phone towers in the area near the Lebovitz's home. Beginning at 12:20 a.m., the Defendant's cellular phone activity was transmitted through one of these three cellular phone towers near the area of the crimes. The Defendant's cellular phone activity continued to use one of the three towers located near the Lebovitz's home until 3:58 a.m., when the Defendant's cellular phone was turned off until 4:23 a.m. Officer Hamilton said that, using a "special engineer's phone," he placed calls in the area of the crimes and one of the three towers predominantly transmitted the signal and "occasionally" the other two towers transmitted the call. Officer Hamilton explained that cellular tower signals overlap in some areas.

Wayne Ledford, the Defendant's cousin, testified that, through his work in the home repair business, he had been involved in multiple home improvement projects on the Lebovitz's house over the course of two to two and a half years. During this time, Ledford said that he converted the attic into living space, remodeled the basement area into a children's playroom, expanded the house to add a storage area, waterproofed the front of the house, and remodeled the master bath room. Ledford recalled that, in August 2008, he was working on some repairs to the Lebovitz home.

Ledford described his relationship with the Defendant as one where the two men would occasionally go to clubs, talked on the phone, and were at family events together. He said that he and the Defendant "never really h[u]ng out." Ledford said that he called and spoke with the Defendant on the day before these crimes after leaving the Lebovitz house for the day. Ledford said that he called the Defendant to see if he wanted to "get together" on Friday or Saturday of that week. Initially, the two men engaged in small talk and then the Defendant asked if Ledford was working. Ledford told the Defendant that he was "baby-sitting" sub-contractors, masons, and a sheet-rock finisher. The Defendant asked if the homeowners were at home while the sheet rock was being torn out of the ceiling in the kitchen. Ledford told the Defendant that the homeowners were out of town while "that demo work" was being done. The Defendant responded saying, "they just let you go in and out of the house like that." Ledford said that he told the Defendant that the homeowners trusted him and that a housekeeper was present most of the time as well as there was a house sitter who was taking care of the family dog.

Ledford testified that the Defendant had been to the Lebovitz house before when the Defendant had picked up Ledford to go to lunch. Ledford said that he had also shown the Defendant before and after pictures of the remodeling on the house. Ledford said that on Wednesday, August 6, 2007, he left the Lebovitz house after lunch, around 1:30 p.m. or 2:00 p.m. and went home where he remained until the following morning. Ledford denied borrowing the Defendant's BMW the night of August 6 and stated that he had never driven the BMW. Ledford further denied possessing the Defendant's cellular phone or underwear during the night of August 6.

Ledford testified that, at 7:00 a.m. on August 7, 2008, his boss called to tell Ledford that the Lebovitz's house had been burglarized and the house sitter raped. Ledford arrived at the Lebovitz house at 8:00 a.m., where he found a lot of police officers. Ledford explained that electricians were scheduled to work on the house that day, so he went to the Lebovitz house to let the electricians know they were not needed at that time. Ledford said that police detectives requested a DNA sample, and Ledford agreed. At some point, a police officer asked if anyone knew someone by the Defendant's name, and Ledford told police that was his cousin's name.

On cross-examination, Ledford agreed that, at the time of these crimes, he was "several thousand dollars" behind in his child support payments. Ledford agreed that there were times that the electricity at his home was turned off, explaining that he paid his child support rather than his electric bill on several occasions. He further agreed that, in 2008, he was also two months behind on his mortgage payments. Ledford said that, through his work in the Lebovitz house, he was familiar with the layout. Ledford said that he gave his cellular phone to police who looked at the call log and then returned it to him. Ledford denied owning a Glock pistol.

The State then submitted, by stipulation of the parties, two latent fingerprint reports. Shelly Betts, a Tennessee Bureau of Investigation ("TBI") agent, testified on behalf of a colleague who examined the safe and a claw hammer found in the closet where the safe was kept. Betts said that the TBI was able to conclude that the claw hammer produced two of the tool marks present on the door of the damaged safe that was recovered from the Defendant's BMW. Another tool mark on the safe was produced by a rotating blade, but the mark was insufficient for purposes of comparison with tools collected from the Defendant's BMW.

Linda Littlejohn, a TBI agent, testified as an expert in the area of microanalysis. Littlejohn identified the report she generated from her examination of duct tape submitted in this case. Littlejohn examined a piece of duct tape from the victim and found that it did not match up with the fracture lines found on the end of the roll of duct tape found in the Defendant's car. Her physical comparison of the roll of duct tape and the pieces of duct tape were that the pieces and roll were consistent with respect to size, appearance, and construction.

Michael Turbeville, a TBI agent, testified as an expert in serology DNA. Turbeville said that he examined the victim's blood sample and buccal swabs from Ledford, the victim's boyfriend, and the Defendant. Other items submitted for analysis were the victim's panties, the Defendant's underwear, a pair of gloves, bedding from the guest room of the Lebovitz house where the victim stayed, and the wall safe. The victim's shorts and vaginal and anal swabs failed to reveal the presence of semen. Upon examination of the victim's panties, Turbeville found a limited presence of spermatozoa on the crotch area. The sample was a mixture of DNA from two individuals. The two individuals were identified as the victim and her boyfriend.

Turbeville testified that a pair of black gloves recovered from the Defendant's car also contained a mixture of DNA. The major contributor of the DNA was the Defendant, and the victim could not be excluded as a minor contributor. Turbeville said that he received two pairs of the Defendant's boxer briefs, one pair black and the other white. He swabbed the inside surface of the fly area of the Defendant's black boxer briefs and found the presence of a DNA mixture. The partial profile indicated that the major contributor of the mixture was the victim, and the minor contributor was consistent with the Defendant's DNA profile. Turbeville also tested the second white pair of boxer briefs and found the presence of a DNA mixture in the fly area. The sample contained a complete DNA profile for the major contributor, who was the victim. The minor contributor was consistent with the Defendant's DNA profile. The sample from the white boxer briefs was also compared against Ledford's sample, and he was excluded as a contributor. Turbeville also noted that, although there is no test to confirm, he observed fecal matter on the fly area of the white boxer shorts.

-12-

Melissa Croft testified on the Defendant's behalf. She said that she and the Defendant had a child together. Croft recalled that in the afternoon of August 7, 2008, she called the Defendant and asked him to meet her at "Save-A-Lot" to take her to the hospital. The Defendant drove Croft, in his grandfather's truck, to Memorial Northpark first, but the hospital was "kind of packed," so they proceeded to Erlanger North. After treatment and release from the hospital, the Defendant drove Croft to Walgreens to fill a prescription. The Defendant and Croft then drove to an area on Old Hixson Pike where there was an abandoned house and "had sex" without the use of a condom. Croft estimated they were at that location approximately an hour before driving to a Steak and Shake restaurant to eat, at around 4:00 p.m., located on Hixson Pike. Next, they picked up the Defendant's daughter from school and took her to a McDonald's to let the child "play and eat." After leaving McDonald's, at approximately 8:00 p.m., they drove to the Defendant's house.

Croft testified that, after arriving at the Defendant's home, the Defendant bathed his daughter and put her to bed. Around 10:00 p.m., the Defendant came into the bedroom where Croft was in bed, and the two again engaged in unprotected sex. Croft said that they fell asleep at approximately 4:00 a.m.

Croft testified that the Defendant drove her, in his grandfather's truck, back to her car at around 7:00 a.m. on August 7, 2008. Croft said she did not see the Defendant's BMW while at his house, explaining that she entered and exited through the front door and could not see "the back."

On cross-examination, Croft agreed that, prior to the night of August 6, she and the Defendant were "estranged." The Defendant had custody of their child and would not allow Croft to see the child. Croft admitted to an addiction to "meth" but testified that she had "been clean for two months." Croft said that she had not spoken to the Defendant in eight months when he called her from jail "to talk." She said that she tried to visit him in jail "just recently" but was not permitted to see him because she did not have identification. After the State played a portion of a May 2009 recorded jail telephone conversation between the Defendant and Croft, Croft agreed that, during the conversation, she asked the Defendant when she could see their daughter. Croft did not agree that the Defendant had "control" over her visitation with their daughter, but said that he had "custody of her." Croft explained that the Defendant's response to Croft's request during their telephone conversation to see their child, "I don't know, baby, I need to talk to you," meant that he wanted to make sure she was "clean." Croft denied ever discussing the alibi with the Defendant.

After hearing this evidence, the jury convicted the Defendant of one count of aggravated burglary, one count of especially aggravated kidnapping, one count of aggravated robbery, two counts of aggravated rape, one count of theft of property valued under $500.00,

one count of theft of property valued over $1,000.00, and one count of theft of property valued over $60,000.00.

## C. Sentencing Hearing

The trial court held a sentencing hearing on December 14, 2009, during which the parties presented the following evidence: The State first submitted the presentence report for the record and then called Charles Wells, a Chattanooga police officer as the first witness. Officer Wells testified that in March 2002, he was assigned to investigate an "extremely large amount of burglaries and thefts" at University of Tennessee at Chattanooga ("UTC"). The campus police were overwhelmed by the amount of thefts and burglaries and requested assistance from the police department. When Officer Wells began the investigation, the Defendant, who at the time was a UTC police officer, showed him around the campus.

Officer Wells testified that at some point the investigation began to focus on the Defendant. Officer Wells explained that, in comparing burglaries occurring around the same dates, there was "very little [use] of forced entry." Officer Wells began to suspect that the perpetrator was using keys. During their first meeting, the Defendant had told Officer Wells that there was a "set of keys" that was lost. Ultimately, Officer Wells obtained and executed a search warrant of the Defendant's residence and recovered stolen items. As a result, the Defendant was charged with a series of theft and burglaries that led to a number of guilty pleas by the Defendant. The State offered three certified copies of judgments of misdemeanor theft convictions.

Officer Wells testified that, during the investigation, he also recovered stolen property from another officer who had purchased the items from the Defendant. The Defendant was never charged for this conduct.

After hearing the evidence and applying enhancement and mitigating factors, the trial court sentenced the Defendant to serve five years for the aggravated burglary conviction, twenty years for the especially aggravated kidnapping conviction, twenty years for each of the aggravated rape convictions, ten years for the aggravated robbery conviction, ten years for the theft of property valued over $60,000.00 conviction, three years for the theft of property valued over $1,000.00 conviction, and eleven months and twenty-nine days for the theft of property valued under $500.00 conviction. The trial court then considered consecutive sentencing and ordered the aggravated burglary conviction and the theft of property valued over $60,000.00 to run concurrently and the especially aggravated kidnapping conviction to run consecutively to those convictions. The trial court ordered the aggravated rape convictions to run concurrently to each other and consecutive to the especially aggravated kidnapping conviction. Finally, the trial court ordered the convictions for aggravated robbery,

-14-

theft of property valued over $1,000.00, and theft of property valued under $500.00 to run concurrent to each other and consecutive to the aggravated rape convictions for a total effective sentence of sixty years in the Tennessee Department of Correction.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims the following: (1) the trial court erred when it denied his motion to suppress evidence obtained through an invalid search warrant; (2) the evidence is insufficient to support his convictions for especially aggravated kidnapping, theft of property valued over $1,000.00, and theft of property valued over $60,000.00; (3) the trial court failed to merge his convictions for aggravated robbery, aggravated kidnapping, and theft; (4) the trial court improperly instructed the jury on especially aggravated kidnapping; (5) the trial court erred when it ordered partial consecutive sentencing; (6) the trial court demonstrated bias against the Defendant; and (7) the cumulative effect of the errors deprived the Defendant of a fair trial.

### A. Motion to Suppress

The Defendant contends that the trial court erred when it failed to suppress the evidence obtained during the search of his residence. He asserts that the police illegally entered his property, viewed his BMW, and used that information as a basis for the search warrant. The State responds that the evidence was seized after police officers obtained a valid search warrant and, therefore, the trial court properly denied the motion to suppress.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

We begin our analysis with the Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, which provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, will not be violated, and no warrants will issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Similarly, article I, section 7 of the Tennessee Constitution provides:

> [P]eople shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and not to be granted.

Tenn. Const. art. I, § 7.

"[A] search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause of its issuance." *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999). To establish probable cause to issue a search warrant, an affidavit must supply reasonable grounds for suspicion that an illegal act is occurring. *Id.* Thus, the need for the magistrate to make a neutral and detached decision regarding the existence of probable cause requires that the affidavit contain more than mere conclusory allegations by the affiant. *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992).

An affidavit must show a nexus between the criminal activity, the place to be searched, and the items to be seized in order to give a magistrate probable cause to issue a warrant. *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993). When the affidavit contains no direct evidence of such a nexus, "we must . . . determine whether it was reasonable for the magistrate to infer that the item of contraband listed in the affidavit would be located" in the place to be searched. *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009).

The search warrant affidavit in this case set forth the following grounds:

-16-

On 08-07-08 Thursday at 0522 hours Chattanooga Police Officers responded to 1104 Centennial Drive on a report of a rape. Upon arrival, Police spoke with the victim, [ ]. According to her, she was housesitting for Mr. & Mrs. Allan Lebowitz at the above address. Reportedly, as she slept, she was awakened by the dog barking at the above address where she was spending the night. Reportedly, this occurred at around 0400 hours. According to her, as she woke up, she saw a white male began hitting her. After getting her down on the bed which she was on, the suspect then bound [the victim] with duct tape by bounding her wrists behind her back, and by bounding her ankles together. According to her, during the incident, the suspect told her at least twice that he had "guns." Reportedly, the suspect then asked her where the safe was in the house. After stating that she did not know, the suspect began rummaging through the house until he apparently found the safe in the upstairs master bedroom area. The victim stated that the suspect then came back downstairs to her bedroom, pulled her shorts down to her taped ankles, and raped her vaginally. After raping her, he went in to her backpack, stole her money, her driver's license, and her car keys to her Ford Escort. Moments later she would hear the suspect driving her car away, and later confirmed that the suspect had stolen her car. [The victim] stated that the suspect was a white male in his 20's or 30's who was slender in build. According to her, the suspect was wearing a hat with a bandana covering the lower part of his face. [The victim] stated that the suspect was also wearing work gloves and a tool belt. Police would later find a hammer near the hold in the wall where the family's safe had been located. [The victim's] vehicle was later recovered around the 1500 block of Mississippi Ave. Earlier in the night, at around 0200 hours, Chattanooga Police received as suspicious vehicle call at 1509 Mississippi Avenue. According to the reporting part on that call, Mr. Leslie Werner, he saw a white male, approximately 6'0 to 6'2 in height, with a slender to medium build and with little or no hair. Reportedly, Mr. Werner observed this party exit a dark colored automobile, and prowl through several of his neighbor's driveways. Officer Timmons who responded, stated that he observed a black BMW vehicle (Tn 907 QXT), whose tag came back to [The Defendant] who resided at 1755 Varner Road. Officer Timmons noted that the vehicle did not come back to anyone who resided in that area. It was on that same block that the victim's car was recovered. The black BMW (907 QXT) was no longer present. The locations of both the victim's vehicle and the black BMW were within a short distance of the crime scene. Investigators then spoke with David Haught, the Superintendent for EMJ Corporation. EMJ Corporation had been doing renovations at the above residence since around the middle of July due to storm damage to the house. Mr. Haught was present with his foreman, Mr. Freddie

-17-

Wayne Ledford, Jr. Upon asking Mr. Haught if he had a [person with the Defendant's name] working for him, Mr. Ledford stated that [the Defendant] was his cousin. Ledford also stated that [the Defendant] lived in the Middle Valley area, and that he drove a black BMW and a 1500 pickup truck. Investigators saw a GMC 1500 pickup truck at 1755 Varner Road on August 7, 2008. A record search revealed a GMC 1500 pickup truck with a VIN number of: 2GCEK19ROV1117659, registered to that address. Ledford went on to state that he had last spoken to [the Defendant] on 08/06/08 at around 1630 hours. According to Ledford, they had discussed how Ledford was still working on the house at 1104 Centennial Drive, and how the owners were not in town, and how they had given Ledford permission to enter the residence as he needed to in order to finish his work. Ledford also stated how he had told Roberson how a young, good looking girl was house sitting for the owners.

Hamilton County Sheriff's Department Deputies responded to 1755 Varner Road at our request and located [the Defendant] and the black BMW (907 QXT). Also, at [ ] the residence, was Mr. Richard Roberson who stated that he is [the Defendant's] grandfather, and that his address is 1755 Varner Road.

Based on the above information, I believe evidence regarding the offenses of Aggravated Rape, Especially Aggravated Burglary, Aggravated Robbery, and Theft of a Vehicle could exist at 1755 Varner Road in Hamilton County Tennessee, and on or in the aforementioned vehicles, and the person of [the Defendant].

The evidence does not preponderate against the trial court's findings that the search warrant is valid. The affidavit includes specific language about the crimes committed, evidence linking the Defendant to the crimes, and a basis for belief that items relating to the crimes would be found in the Defendant's home, car, or on his person. This information supported issuance of the search warrant and, therefore, the evidence seized in this case was found pursuant to the lawful execution of the search warrant.

We further note that the officers' observations while approaching the residence were not unlawful. Our courts have held that a person does not have an expectation of privacy "in the area in the front of his residence which leads from the public way to the front door." *State v. Baker*, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981), *overruled on other grounds*; *see State v. Holt*, 691 S.W.2d 520, 522 (Tenn. 1984); *see also Illinois v. McArthur*, 531 U.S. 326, 335 (2001) (noting that "a person standing in the doorway of a house is 'in a public place,' and hence subject to arrest without a warrant permitting entry of the home"). A sidewalk or

-18-

pathway leading from a public street to the front door of a residence represents an "implied invitation" to the public to use the pathway in pursuing legitimate business or social interests with those inside the residence. *State v. Harris*, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995). Police officers, who are conducting official police business, are considered members of the general public. *Id.* at 623-24. Therefore, observations while approaching the residence do not constitute information obtained as a result of a warrantless entry into the residence and could properly be considered in issuing the search warrant. Sheriff's deputies reported to the Defendant's address and detained him at the request of the Chattanooga Police Department. The driveway for this residence wrapped around the side of the house. Police officers pulled into the driveway and parked at the rear corner of the house on the driveway. The Defendant acknowledged that the police officers probably viewed his BMW at that time. Although there was testimony that officers were later walking around in the back yard, the affidavit did not mention or rely upon any observations made during that time.

The Defendant appears to also take issue with the length of time he was detained while police officers obtained a search warrant. Generally, a suspect may be temporarily detained outside his or her residence and prevented from entering the residence unaccompanied by a police officer for a reasonable time while the police obtain a search warrant. *See McArthur*, 531 U.S. at 331-33. In the present case, the officers arrived at almost 2:00 p.m., and the search warrant was signed at 8:44 p.m. and executed shortly thereafter. Considering the time of night, the distance of travel to secure a warrant, the coordination of county officials and city officials for jurisdictional purposes, the drafting of the warrant, and the securing of a magistrate to approve the warrant, we conclude this period of time was "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id*. at 332.

Accordingly, the trial court did not err when it denied the Defendant's motion to suppress. The Defendant is not entitled to relief.

### B. Sufficiency of the Evidence

The Defendant attacks his convictions for especially aggravated kidnapping, theft of property valued over $1,000.00, and theft of property valued over $60,000.00. The State responds that the evidence was sufficient to sustain the especially aggravated kidnapping and theft of property valued over $1,000.00 conviction. The State concedes that there was not sufficient evidence to support the value of the theft of property over $60,000.00, but maintains that the evidence is sufficient to support theft of property valued over $10,000.00.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999)( (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a

defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## 1. Especially Aggravated Kidnapping

The Defendant asserts that serious bodily injury is an essential element of the criminal offense of especially aggravated kidnapping. The Defendant argues that the indictment charging him with especially aggravated kidnapping does not allege serious bodily injury and that the State failed to present any evidence at trial of serious bodily injury to the victim. He argues that the State also failed to present evidence that the Defendant used a deadly weapon to accomplish the kidnapping. Finally, he argues that the evidence is insufficient to establish kidnapping because the confinement was incidental to the burglary.

Tennessee Code Annotated section 39-13-305(a) defines the offense of especially aggravated kidnapping as follows:

(a) Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302:

(1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; [*or*]

(2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement; [*or*]

(3) Committed to hold the victim for ransom or reward, or as a shield or hostage; *or*

(4) Where the victim suffers serious bodily injury.

(b)(1) Especially aggravated kidnapping is a Class A felony.

(emphasis added). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302 (2010).

We first note that the statutory elements of especially aggravated kidnapping are listed

in the alternative, thus, the State was not required to prove both serious bodily injury and use of a deadly weapon. Rather, the State was required to show one of the listed elements. As the Defendant correctly notes, the indictment does not allege serious bodily injury. The indictment does, however, allege that the Defendant unlawfully and knowingly confined the victim with the use of a deadly weapon or "by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id*. Therefore, we will review the evidence supporting this conviction accordingly.

The evidence, viewed in the light most favorable to the State, shows that the Defendant entered the house where the victim was "house sitting" and ordered her to put down her cell phone. He then hit the victim in the face with a hard object and bound her hands and feet with duct tape. The Defendant told the victim he had guns and would use them. The Defendant left the victim helpless to free herself or seek help while he forcibly removed the homeowner's safe from the upstairs master bedroom. Upon completing this task, he returned to the room where the victim was bound and raped the victim both anally and vaginally. After raping her, he took her driver's license from her wallet and threatened to find her if she contacted police. After leaving the victim, he returned, took her car key, and drove her vehicle a short distance from the house before abandoning it.

Based upon this evidence, a rational juror could find that the Defendant knowingly confined the victim unlawfully in the bedroom by binding her hands and feet with duct tape, thus interfering substantially with the victim's liberty. The Defendant argues that the State did not prove that the Defendant accomplished the false imprisonment with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. We respectfully disagree. The victim testified to seeing a small light emanating from an object in the Defendant's hand. The police later found, in the Defendant's car, a small light that attaches to the barrel of a pistol. The small light was found near a pistol wrapped in a shirt. The Defendant repeatedly hit the victim with the hard object in his hand that projected a small light until she released her cellular phone as he had commanded her to do. This conduct by the Defendant resulted in marks and swelling on the victim's face. The Defendant told the victim he had guns and would use them. We conclude that this is sufficient evidence upon which a jury could find the Defendant accomplished the kidnapping with a deadly weapon.

The Defendant also argues that the kidnapping was incidental to the burglary. In our view, the evidence supports the jury's determination that the Defendant committed both an especially aggravated kidnapping and an aggravated burglary. We will explain our reasoning in detail later in this opinion, as the Defendant also makes this argument in relation to his assertion that the trial court erred in instructing the jury.

-22-

## 2. Theft of Property Valued over $1,000.00

The Defendant argues that his conviction for theft of property valued over $1,000.00 should be reversed because the victim testified she did not know the vehicle's worth. The State responds that the proof at trial supported the jury's finding of guilty beyond a reasonable doubt as to this conviction. We agree with the State.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2010). Theft of property valued over $1,000.00 but less than $10,000.00 is a Class D felony. T.C.A. § 39-14-105(3) (2010)

The evidence, viewed in the light most favorable to the State, shows that the Defendant took the victim's car keys from her backpack without her consent and left the scene of the crime in her vehicle. The victim testified that she did not know the value of the vehicle. Officer Mercado testified that the victim's car was a two-door Ford Escort. He then testified to the Kelly Blue Book value of a Ford Escort. A two-door Ford Escort in "excellent condition" is valued at $3,665.00, in "good condition" $3,270.00, and in "fair condition" $2,805.00. Officer Mercado testified that the victim's vehicle was in the "fair" category and photographs of the victim's vehicle were submitted to the jury. Even though the victim did not testify as to the value of her car, the officer's testimony is sufficient to establish that the value of the car was greater than $1,000.00, as charged in the indictment. The Defendant is not entitled to relief as to this issue.

## 3. Theft of Property Valued over $60,000.00

The Defendant argues that the proof at trial did not show that the value of the items taken from Lebovitz was over $60,000.00. The State concedes that the proof at trial did not establish that the stolen property had a value over $60,000.00.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2010). Theft of property valued over $60,000.00 but less than $250,000.00 is a Class B felony. T.C.A. § 39-14-105(5) (2010).

Lebovitz testified at trial that the contents of the safe were worth $57,612.00, and he estimated the value of the safe as between $1,000.00 and $2,000.00. This evidence does not support the Defendant's conviction for theft of property valued over $60,000.00. The value of the property taken is an element of the offense of theft. T.C.A. § 39-14-105 (2010); *State v. Mike Wayne Tate*, No. 03C01-9204-CR-127, 1993 WL 55631, at * 2 (Tenn. Crim. App.,

at Knoxville, March 4, 1993), *perm. app. denied* (Tenn. June 1, 1993). Thus, because the State presented insufficient proof that the value of the subject property was more than $60,000.00, the Defendant's conviction for theft of property valued over $60,000.00 may not stand. The proof was sufficient, however, to prove beyond a reasonable doubt that the safe and contents therein had a value in the range of $58,612.00 to $59,612.00. As a result, the Defendant's conviction for theft of property valued over $60,000.00 must be modified to theft of property valued over $10,000.00 but less than $60,000.00, a Class C felony, and the sentence modified to four years and six months of confinement. (mid-range) *See State v. Darryl Keith Robinson*, No. W2008-02069-CCA-R3-CD, 2010 WL 376627 (Tenn. Crim. App., at Jackson, Feb. 3, 2010), *perm. app. denied* (Tenn. June 16, 2010) (reducing a jury verdict of theft of property over $10,000 but less than $60,000 to a misdemeanor theft conviction).

## C. Merger

The Defendant contends that his convictions for theft of property valued over $10,000.00[2], theft of property valued over $1,000.00 and theft of property valued under $500.00, should be merged with his conviction for aggravated robbery. The State responds that the circumstances surrounding the Defendant's convictions for theft of property and aggravated robbery support multiple convictions, because the convictions involve more than one victim and more than one discrete act.

Both the United States and Tennessee Constitutions protect against twice being put in jeopardy for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The double jeopardy clause contains three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996).

Legislative intent is the key issue when reviewing cases that are a single prosecution involving multiple punishments. *Id.* at 379. Therefore, "[w]here the Legislature has indicated that cumulative punishment is intended, the double jeopardy analysis need not proceed any further." *State v. Godsey*, 60 S.W.3d 759, 777. When the legislative intent is not clear, however, this Court must apply the *Blockburger* same elements test. *State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012).

---

[2] Based upon our determination that the evidence does not support a conviction for theft of property over $60,000, we now refer to this conviction as theft of property over $10,000.

In *Watkins*, our Supreme Court laid out the analysis we are to undertake:

> The first step of the Blockburger test is the threshold question of whether the convictions arise from the same act or transaction. This threshold question should be answered by reference to the charging instrument and the relevant statutory provisions. Here it is appropriate to consider whether the charges arise from discrete acts or involve multiple victims. Thus, what was formerly the third Denton factor now appropriately has a role to play in the threshold inquiry. If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment. Thus, a threshold determination that multiple convictions do not arise from the same act or transaction ends the inquiry and obviates the need for courts to further analyze double jeopardy claims. . . .
>
> If the threshold is surpassed, meaning the convictions arise from the same act or transaction, the second step of the Blockburger test requires courts to examine the statutory elements of the offenses. If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

*Id.* at 556-57.

### 1. Theft of Property Valued Over $10,000.00

The Defendant contends that the conviction for theft of property valued over $10,000.00 and the conviction for aggravated robbery should be merged. We find that these two offenses are discrete acts. The indictment charging the Defendant with the offense of aggravated robbery states as follows:

> That [the Defendant] heretofore on August 7, 2008, in the County aforesaid, did unlawfully and intentionally or knowingly take property from the person of [the victim], by violence or putting the victim in fear, and the defendant accomplished the offense with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . .

The indictment charging the Defendant of the offense of theft of property valued over $60,000.00 states as follows:

> That [the Defendant] heretofore on August 7, 2008, in the County aforesaid, did unlawfully and knowingly obtain or exercise control of property, valued at over $60,000.00 belonging to Alan and Alison Lebovitz, without the owner's effective consent and with the intent to deprive the owner of said property . . . .

As to the aggravated robbery, the Defendant entered the victim's bedroom holding a hard object with a light that he used to hit the victim repeatedly. He told the victim he had guns and would use them. The Defendant took cash and the victim's driver's license from her wallet, telling her he would keep her identification in order to find her if she reported him to the police. As to the theft of property valued over $10,000.00, the Defendant broke the basement door to enter the Lebovitz house and forcibly removed the Lebovitz's wall safe from the closet in the master bedroom. The contents of the safe were worth in excess of $50,000.00.

Accordingly, we conclude that the Defendant's convictions for aggravated robbery and theft of property valued over $10,000.00 were discrete acts involving different victims and, therefore, do not violate the double jeopardy protection against multiple punishments. The Defendant is not entitled to relief as to his issue.

## 2. Theft of Property Valued Over $1,000.00

The Defendant contends that the conviction for theft of property valued over $1,000.00 and the conviction for aggravated robbery should be merged. We conclude that these two offenses are discrete acts.

As we stated above, as to the aggravated robbery conviction, the Defendant entered the victim's bedroom holding a hard object with a light that he used to hit the victim repeatedly. He told the victim he had guns and would use them. The Defendant took cash and the victim's driver's license from her wallet, telling her he would keep her identification in order to find her if she reported him to the police. The evidence supporting the conviction for theft of property valued over $1,000.00 was that, after telling the victim he was leaving, the Defendant returned to the room where the victim was bound and took her car keys from her backpack. The Defendant had no interaction with the victim at this point. He made no threats and used no violence in taking the car keys. The Defendant exited through the front door of the house and drove away from the crime scene in the victim's two-door Ford Escort, valued over $1,000.00.

These offenses involved discrete acts on the part of the Defendant. The aggravated robbery is based on his intentional theft of the victim's cash and identification by violence accomplished with the use of a deadly weapon or an item used to lead the victim to believe it was a deadly weapon. The theft conviction is based on the Defendant having knowingly obtained or exercised control over the victim's vehicle without her consent and with the intent to deprive her of her vehicle. The Defendant's return, after telling the victim he was leaving, supports the State's theory that the Defendant formed the intent to steal the car *after* raping and robbing the victim.

In *State v. Randy Parham*, the defendant violently beat the victim and took her money, jewelry, and the keys to her car from her purse before leaving in the victim's truck. No. W2009-02576-CCA-R3-CD, 2010 WL 527612, at *6 (Tenn. Crim. App., at Jackson, Dec. 10, 2010) *no Tenn. R. App. P. 11 application filed*. For these crimes the defendant was charged and convicted of several offenses, two of which were aggravated robbery, for his intentional or knowing theft of the victim's cash and jewelry by violence with the use of a deadly weapon, and theft for his knowingly exercising control over the victim's vehicle without her consent and with the intent to deprive her of the vehicle. On appeal this Court held that the trial court did not err by not merging the defendant's convictions for aggravated robbery and theft because those convictions involved discrete acts. *Id.* The Court reasoned that the theft did not occur when the defendant removed the keys from the victim's purse but when the defendant knowingly obtained or exercised control over the vehicle itself. *Id.* We find this reasoning also applicable in the present case. Moreover, the Defendant did not take the victim's keys at the time he robbed her of her wallet and identification as the defendant did in *Randy Parham*. The Defendant in this case completed his aggravated robbery of the victim, announced his departure and left the bedroom. He then returned and, without any further word or action toward the victim, took the car keys and left the house. Thereafter, exercising control over the victim's vehicle, he drove it a short distance away before abandoning it. In our view, these facts support a finding that the Defendant committed two discrete acts when he: (a) robbed the victim of her money and identification, and (b) stole her vehicle.

Accordingly, we conclude that the Defendant's convictions for aggravated robbery and theft of property valued over $1,000.00 were discrete acts and, therefore, do not violate the double jeopardy protection against multiple punishments. The Defendant is not entitled to relief as to his issue.

### 3. Theft of Property Valued Under $500.00

The Defendant contends that the conviction for theft of property valued under $500.00 and the conviction for aggravated robbery should be merged.

-27-

The theft of property valued under $500.00 resulted from a single criminal act. The Defendant went through the victim's backpack and took her driver's license and $60.00 before telling her he would return to remove the duct tape before the housekeeper arrived. The aggravated robbery conviction is also based on the Defendant's entry into the victim's bedroom holding a hard object with a light that he used to hit the victim repeatedly. He told the victim he had guns and would use them. The Defendant then went through the victim's backpack and took her driver's license and $60.00. He told her that he would keep the victim's driver's license in order to find her if she reported him to the police.

Thus, we must examine the statutory elements of the offenses under the second step of the *Blockburger* test. The two offenses at issue are aggravated robbery and theft. Aggravated robbery requires proof of a theft, therefore, theft does not require proof of an additional fact that aggravated robbery does not require.

After application of the *Blockburger* same elements test, we conclude that the Defendant's convictions for aggravated robbery and theft of property valued under $500.00 violate the principles of double jeopardy. The offenses have a single victim and stem from a single act. The statutes are not distinct under *Blockburger*. We hold that the finding of guilt for the theft of property valued under $500.00 conviction should be merged with the aggravated robbery conviction. The judgment of conviction for theft of property valued under $500.00, therefore, is vacated.

### D. Jury Instruction

The Defendant contends that the trial court erred in instructing the jury on especially aggravated kidnapping, because serious bodily injury was not alleged in the indictment, the State offered no proof of serious bodily injury, and the trial court failed to define serious bodily injury. He argues that the trial court also failed to instruct the jury as required by *State v. White*, 362 S.W.3d 559 (Tenn. 2012). The State responds that the trial court properly instructed the jury.

The trial court instructed the jury on especially aggravated kidnapping and the lesser-included offenses of aggravated kidnapping, kidnapping, and false imprisonment. Regarding the aggravated kidnapping instruction, the trial court stated as follows:

> For you to find the defendant guilty of this offense the state must have proven beyond a reasonable doubt the existence of the following essential elements. One, that the defendant removed or confined another unlawfully [so] as to interfere substantially with the other's liberty; and two, that the confinement or removal was accomplished with a deadly weapon or by display of any article

used or fashioned to lead the alleged victim to reasonably believe it was a deadly weapon, and three the defendant acted knowingly. A removal or confinement is unlawful if it is accomplished by force, threat or fraud.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S .W.3d 521, 524 (Tenn. 2001).

"A defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id*. (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). With this in mind, we turn to the Defendant's claims with regard to his jury instructions.

We have already addressed the Defendant's issue with regard to especially aggravated kidnapping and the element of "serious bodily injury." Because the statutory elements are

listed in the alternative, the State was not required to show serious bodily injury *and* the use of a deadly weapon. Based upon the evidence, the State proceeded under the theory that the Defendant used a deadly weapon or an item the victim reasonably believed was a weapon to accomplish the confinement. The State was not required to prove serious bodily injury nor was the trial court required to define this element in this case. The jury instructions correctly reflect the elements listed in the indictment upon which the State proceeded. Therefore, the trial court did not err in this respect.

Next, the Defendant relies on *State v. White* in his assertion that he deserves a new trial because the trial court failed to specifically instruct the jury on the term "substantial interference." In *State v. White*, our Supreme Court held that trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony. *White*, 362 S.W.3d at 578. Our Supreme Court further opined that whether removal or confinement was or was not essentially incidental to an accompanying "offense" is a jury question, to be reviewed by the appellate courts under a sufficiency of the evidence standard. *Id*. The Supreme Court held that, to protect the defendant's due process rights, the jury should be instructed that it must determine that the removal or confinement of the victim was "significant enough, standing alone" to support a conviction of kidnapping before imposing one when an overlapping felony accompanies the kidnapping charge. *Id*. The Supreme Court also developed a jury instruction to be provided to facilitate the jury's determination of whether the removal or confinement was essentially incidental to the accompanying offense:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;

-30-

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*Id.* at 580–81; *see* 7 Tenn. Prac. Pattern Jury Instr. T.P.I. -Crim. 8.01 - .03, 8.05 (footnote omitted) (citing *White*, 362 S.W.3d at 578-81).

Under *White*, an instruction is required if the proof "fairly raised" a question of whether there was a kidnapping offense separate from the accompanying felony, or as in this case, felonies. *See State v. Bennie Osby*, No. W2012-00408-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. Nov. 2, 2012), *perm. app. filed* (Tenn. Dec. 11, 2012). The same instructional error that existed in *White* is present in this case - the jury was not adequately charged on the question of whether the victim's removal or confinement, as an element of especially aggravated kidnapping, was essentially incidental to the aggravated rapes or the aggravated robbery of the victim. In consequence, the lack of the instruction set out in *White*, while entirely understandable because the trial in this case predated the Supreme Court's ruling in *White*, is constitutional error. We, therefore, consider whether the error was harmless beyond a reasonable doubt.

The facts support a conclusion that the Defendant's continued restraint of the victim was not in order to accomplish the rape, which had already occurred, nor was it inherent in the then-completed robbery. We note that kidnapping is a continuous crime. *State v. Legg*, 9 S.W.3d 111, 117 (Tenn. 1999) ("[A]n act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime [of kidnapping] at every moment the victim's liberty is taken."); *see State v. Campbell*, 245 S.W.3d 331, 337 (Tenn. 2008) (noting the Court's conclusion in *Legg* that the crime of kidnapping "continued until [the victim's] liberty was restored"). This Court has taken an expansive view of kidnapping. *See State v. Evangeline Combs and Joseph D. Combs*, Nos. E2000-02801-CCA-R3-CD and E2000-02800-CCA-R3-CD (Tenn. Crim. App. Sept. 25, 2002) (stating in a case involving kidnapping arising from seven years of enslavement and torture, "we reject the Defendants' argument that no confinement was proved because she escaped on three occasions and voluntarily returned twice"), *perm. app. denied* (Tenn. Jan. 27, 2003). Here, the Defendant completed the robbery, and rapes of the victim, who was restrained with duct

tape. The Defendant had bound the victim, isolated her from her phone, and left her restrained in the Lebovitz home while he left for a period of time. The Defendant later returned, took the victim's car keys, stole the victim's car, and abandoned the car a short distance away, presumably to prevent the victim from summoning help. These acts constitute confinement that was clearly beyond what was necessary to accomplish the accompanying offenses. We conclude that the lack of the *White* instruction was harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

### E. Consecutive Sentencing

The Defendant argues that the trial court incorrectly ordered some of his sentences to run consecutively. The State responds that the record supports the trial court's application of enhancement factor (4), that the Defendant is a dangerous offender, in ordering consecutive sentencing in this case. *See* T.C.A. § 40-35-115(b)(4) (2010). We agree with the State.

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1) - (7) (2010). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court found, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115 (4) (2010). Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn.1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

In discussing the applicability of the "dangerous offender" category to the Defendant, the trial court stated the following:

> I have to say that this is one of the worst cases that I've heard since I've been a judge or even a DA as far as dangerousness and the frightening nature of it

to all the parties involved. I do find that under TCA 40-35-114(4), that the defendant is a dangerous offender based on all of his behavior: Coming in at night, sneaking in on the victim, he knew she was there, he knew it was a young girl, a college student who was baby-sitting the dog and the house. He knew apparently that there was a safe in the house. He came in apparently with a gun and many tools. Made threats to the victim. Threatened to find her at her house if she told anybody, left her bound where it was very difficult for her to call for help.

The trial court stated that "community safety" was "very important" in its consideration of consecutive sentencing and that in ordering an "appropriate" sentence for these crimes, it would run some of the sentences "concurrent, some consecutive."

We conclude that the evidence supports the trial court's imposition of consecutive sentences. The evidence proved that the Defendant, who had previously committed similar crimes, broke into the Lebovitz's house in the middle of the night, knowing that a young college student was staying there to care for the family dog. While inside the house to steal the Lebovitz's safe, the Defendant hit, bound, raped and robbed the victim. The Defendant threatened the victim, calling her by name, and took her driver's license so he would know where to find her if she sought help. The Defendant left the victim bound with her cellular phone out of reach and stole her car, abandoning it a short distance away. This evidence supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the offenses committed.

The Defendant argues that the trial court improperly ordered consecutive sentencing *and* enhanced his sentence based on his extensive criminal history. Our review of the record reveals that the trial court only applied enhancement factor (4), that the Defendant was a dangerous offender, in concluding that consecutive sentencing was appropriate in this case. *See* T.C.A. § 40-35-115(b)(4).

Accordingly, we conclude that the trial court did not err when it ordered consecutive sentencing in this case. The Defendant is not entitled to relief.

### F. Judicial Bias

The Defendant claims that the trial court showed bias in favor of the State throughout the proceedings to such a degree that it deprived him of a fair trial. The State responds that the trial court acted properly and the Defendant received a fair trial. We agree with the State.

A judge should recuse himself or herself whenever the judge's "impartiality [could]

-33-

reasonably be questioned." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (quoting Code of Judicial Conduct, Canon 3(C)) (now part of Tenn. Sup. Ct. R. 10, Canon 3(E)(1)). Further, recusal is appropriate "when a person of ordinary prudence in the judge's position . . . would find a reasonable basis for questioning the judge's impartiality." *Id*. (footnote omitted). Accordingly, a trial judge addressing a motion for recusal must determine whether he or she has a subjective bias against the defendant and whether the trial judge's impartiality could reasonably be questioned under an objective standard. *State v. Connors*, 995 S.W.2d 146, 148 (Tenn. Crim. App. 1998). Pertinent to the Defendant's failure to seek recusal in the trial court, we note that "[w]hile a party should seek to take whatever action reasonably available to prevent or nullify an error[,] a trial judge must disqualify himself sua sponte under certain circumstances." *State v. Ernest Gentry Burton*, No. M2008-00431-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., Nashville, Aug. 3, 2009), *perm. app. denied* (Tenn. Dec. 14, 2009). However, adverse rulings by a trial court do not, standing alone, establish judicial bias requiring recusal of the trial court. *See, e.g., Herrera v. Herrera*, 944 S.W.2d 379, 397 (Tenn. Ct. App. 1996).

In the present case, the Defendant's brief lists multiple adverse rulings relative to the admission or exclusion of evidence and sentencing that the Defendant claims shows the trial judge held some bias in favor of the State. Our review of the record indicates otherwise. It is well established that the mere fact that the trial judge did not rule in favor of the Defendant in every instance does not equate to judicial bias. *Id.* The Defendant is not entitled to relief on this issue.

### G. Cumulative Error

The Petitioner contends that if this Court concludes that none of the errors raised, standing alone, amounts to prejudicial error, their cumulative effect violated the Defendant's constitutional right to a fair trial.

"We recognize that while individual errors may not necessitate [relief], the combination of multiple errors may necessitate reversal of a conviction in order to ensure a [petitioner] receives a fair trial." *Chad Hughes v. State*, No. M2008-01531-CCA-R3-PC, 2009 WL 1409776, at *7 (Tenn. Crim. App. May 19, 2009) (citing *State v. Zimmerman*, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1999)). We have determined that there were two errors entitling the Defendant to relief. Relative to any other alleged errors, we found none, harmless or otherwise.

Therefore, there are no errors in these proceedings that "have a cumulative effect on the proceedings so great as to require reversal in order to preserve [the Defendant's] right to a fair trial." *Hester*, 324 S.W.3d at 76. Accordingly, the Defendant is not entitled to relief

-34-

on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm in part, reverse in part, and modify in part, the judgments of the trial court. We remand to the trial court for the entry of judgments consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE